**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

ALPHONSO TOLIVER,

        Plaintiff,

                                   Case No. 3:15-cv-1010-J-34JRK

vs.

CITY OF JACKSONVILLE,

        Defendant.

_____/

# O R D E R

    **THIS CAUSE** is before the Court on Defendant City of Jacksonville's Dispositive Motion for Summary Judgment (Doc. No. 20; Motion), filed on July 7, 2016.  On July 25, 2016, Plaintiff Alphonso Toliver filed his response in opposition to the Motion.  See Plaintiff's Response in Opposition to Defendant City of Jacksonville's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. No. 24; Response).[2]  Accordingly, this matter is ripe for review.

## I.    Standard of Review

    Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a).  The record to be considered on a motion for summary judgment may include "depositions, documents,

---

[2]    In support of the Motion, the City filed various depositions and documents.  See Doc. Nos. 20-1—20-34.  The Court will refer to these attachments in their numerical order as City Ex. ___.  Similarly, Toliver has submitted depositions and documents in support of the Response.  See Doc. Nos. 24-1—24-11.  However, because many of these exhibits are duplicates, including all of the exhibits cited in this Order, the Court will only cite to one copy, not both.

electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Rule 56(c)(1)(A).[1]  An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-movant.  See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted).  Substantive law determines the

---

[1]       Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."  Rule 56 advisory committee's note 2010 Amendments.

> The standard for granting summary judgment remains unchanged.  The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law.  The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id.  Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

2

materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.  In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## II.    Background[3]

Plaintiff Alphonso Toliver (Toliver) brings this case against Defendant City of Jacksonville, Florida, (the City) for disability discrimination based on disparate treatment in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., as amended by the ADA Amendments Act of 2008 (ADAAA), Pub. L. No. 110-325, 112 Stat. 3353 (2008) (Count I), and the Florida Civil Rights Act (FCRA), Chapter 760, Florida Statutes (Count II).  See generally Complaint (Doc. No. 1; Complaint) at 7-11.  Toliver also alleges violations of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 et seq. See id. at 11-14.  Specifically, he alleges a claim for interference with his rights under the FMLA (Count III), and an FMLA retaliation claim (Count IV).  See id.

Toliver began his employment as a corrections officer with the Jacksonville Sheriff's Office (JSO), a division of the City, on December 15, 2000.  Complaint ¶ 14.  Pursuant to JSO's Corrections Officer Physical Abilities Test Policy (City Ex. 6; JSO CO PAT Policy),

---

[3]      As discussed above, because this case is before the Court on the City's Dispositive Motion for Summary Judgment, the facts recited herein and all reasonable inferences therefrom have been viewed in a light most favorable to Toliver.  See Clark, 929 F.2d at 608.

all corrections personnel are required to maintain "a satisfactory level of health and physical fitness" that is evaluated annually via completion of JSO's Physical Abilities Test (PAT).[4] City Ex. 6.  According to the JSO CO PAT Policy, in order to have the opportunity to complete the PAT, a corrections officer must first be cleared to be working at full duty capacity.  See id.  In other words, a corrections officer may not attempt to complete the PAT if he or she has been placed on temporary limited duty, also referred to as light duty, for any reason.  See id.  Per JSO's General Order XXI.17(21) (City Ex. 14; Leave Policy), to return to full duty, an employee must obtain a physician's release statement indicating that the employee is cleared to do so.  City Ex. 14.  According to both the JSO CO PAT Policy and the terms of the City's Collective Bargaining Agreement with the Fraternal Order of Police (City Ex. 8; Collective Bargaining Agreement) – which also applies to corrections officers – failure to complete the PAT within one year of the last successful attempt, after having been given a reasonable opportunity to do so, results in the possibility of removal from one's position as a corrections officer.  See City Ex. 6, City Ex. 8.  Notably, between 2000 and 2011, Toliver successfully completed the PAT at every required interval.  See Office of the Sheriff Consolidated City of Jacksonville Corrections Physical Abilities Test Score Sheets (City Ex. 7).

On December 18, 2012, Toliver was involved in an automobile accident, resulting in serious injuries to his right leg which required surgery.  See Complaint ¶ 16.  While recuperating, Toliver successfully submitted a request for FMLA leave commencing on December 18, 2012, and ending on March 12, 2013.  See Toliver's FMLA Leave Requests (City Ex. 11; FMLA Leave Request(s)).  At the conclusion of his approved FMLA leave,

---

[4]   In various submissions, the parties alternatively refer to the PAT as the "Physical Agility Test."

Toliver remained limited in his ability to walk or stand for extended periods of time due to his injuries.  Complaint ¶ 17.  As a result, following his return from FMLA leave, Toliver requested to be placed on light duty beginning on March 22, 2013.  See Toliver's Request for Temporary Medical Limited Duty (City Ex. 12).  JSO's Leave Policy defines light duty as a "duty assignment required by a medical . . . impairment that debilitates an employee to such a degree that a treating medical provider states [] that the affected employee can no longer perform the duties required of his job description."  City Ex. 14.  For an officer to qualify for light duty, his impairment must be both treatable and of "limited duration," or existing for not more than one year.  See id.  Due to his injuries, Toliver requested an assignment limiting his work-related duties to those that did not involve: (1) prolonged standing; (2) squatting; or (3) lifting more than ten pounds.  See Documentation Supporting Light Duty Request (City Ex. 13).  JSO granted Toliver's request and assigned him to work regular shifts in the "pod" control room at the City's correctional facility.  Complaint ¶ 21. Although control room assignments are allocated among both full and limited-duty corrections officers, JSO traditionally designates this assignment for officers on light duty. See Deposition of Tara Wildes (City Ex. 3; Wildes Dep.) at 9-10.  As part of this assignment, JSO required Toliver to visually oversee segments of the inmate population; however, JSO did not permit him to have any direct contact with general population inmates, and did not allow him to leave the control room for any reason.[5]  See Deposition of Janice Plucknett (City Ex. 9; Plucknett Dep.) at 120-22.

---

[5]    This is significant under the circumstances of this case because JSO's Corrections Officer Job Description (City Ex. 4; Corrections Officer Job Description) describes overseeing, supervising, and counseling inmates as part of the "kind of work" and "examples of work" that the corrections officer position entails.  See id.

On December 18, 2013, Toliver's physician provided the City with a medical update informing his supervisors that Toliver should remain on light duty for an additional three months, and also that Toliver needed to undergo additional surgery to remove a rod from his injured leg.  See Medical Update (City Ex. 13).  In preparation for this surgery, Toliver submitted an additional successful FMLA Leave Request to commence on January 22, 2014, and end on February 4, 2014.  See City Ex. 11.  Following his return from FMLA leave, Toliver's physician requested – in a note dated February 27 – that Toliver remain on light duty with the anticipation that he would be cleared to return to full duty by April 22, 2014.  See UF Health Doctor's Notes (City Ex. 20; Doctor's Note).  In an e-mail dated February 7, 2014, JSO's Occupational Health Manager, Stephanie Harris (Harris), acknowledged another request by Toliver to work no more than five days a week.  See Harris E-mail (City Ex. 33).  Notably, Harris informed Toliver that if this latter request was denied, then he would be required to utilize his remaining FMLA leave in the event he was scheduled to work more than five days in a given week.  See id.

In March of 2014, Harris notified then-JSO Chief of Personnel Janice Plucknett (Plucknett) that Toliver's one year period of light duty was set to expire around the end of the month, and that he had yet to complete the PAT as required.  See Plucknett Dep. at 11-12; 25; see also Limited Duty Spreadsheets (City Ex. 17).  In response, Plucknett set a meeting with Toliver on April 4, 2014, to discuss the expiration of his light duty status as well as his potential options moving forward.  See Plucknett Dep. at 13-14.  Recognizing Toliver's "physical issue," see id. at 33-34, Plucknett provided him with a packet of documents containing information which included the City's policy on requesting accommodations under the ADA, see Deposition of Alphonso Toliver (City Ex. 2; Toliver

Dep.) at 81-82.  In doing so, Plucknett explained to Toliver that he would be unable to remain in the corrections officer position due to having exhausted his one year period of light duty without taking the PAT.  See Plucknett Dep. at 119.  Plucknett contends that she did not discuss any actual accommodations during this meeting, instead informing Toliver that it was necessary to conduct a skills assessment to determine his qualifications for other positions.  See Plucknett Dep. at 113, 118.  As such, Plucknett asserts that she never limited the accommodations that Toliver could request other than "explain[ing] to him the accommodations that [she] knew [they] had available that he could potentially be eligible for."  Id. at 22; see also id. at 106; Civil Service Board Hearing Transcript[6] (City Ex. 5; CSB Transcript) at 63.  Specifically, Plucknett mentioned that there were open positions as a police services technician and as a police emergency communications officer, both within JSO but outside of the Corrections Department.  See Plucknett Dep. at 18.

According to Toliver, Plucknett told him that the only available accommodations were a select few positions with the City which would have required their own separate applications.  See Toliver Dep. at 22-23, 78-79; CSB Transcript at 40.  Plucknett also told Toliver that there was no guarantee that he would receive one of these open positions, and that he "had to apply for them like any other job applicant."  Toliver Dep. at 89-90.  In discussing these positions, Plucknett further mentioned that they would require Toliver to transfer from the corrections officer pension plan to the general employee pension plan. See CSB Transcript at 63-64.  Believing these to be his only options, Toliver was concerned that these positions would offer lower compensation and less favorable retirement benefits. See Toliver Dep. at 21.  Indeed, when asked to reflect upon his concerns with transferring

---

[6]        For a brief discussion of Toliver's proceedings before the Civil Service Board, see infra at 11.

to another position, Toliver said, "You lose your pension, you lose your time, you lose basically everything."  CSB Transcript at 25.

Toliver refused to proceed further with the accommodation process as described by Plucknett.  See id.  In making this decision, Toliver did not read any of the documents provided by Plucknett, instead relying on "what she actually told [him]."  Toliver Dep. at 100.  Toliver then drafted a memo addressed to Plucknett entitled "No ADA", in which he stated, "I [,] A. Toliver [,] will not be receiving ADA help.  I'm able to do my job and pass the PAT."  Interdepartmental Correspondence (City Ex. 19).  Toliver also mentioned that he would return "that [same] day" with a doctor's note authorizing him to return to full duty; however, he did not.  Plucknett Dep. at 65.  Even so, Plucknett offered Toliver the opportunity to reconsider his decision not to proceed with the accommodation process, giving him until April 18, 2014 to do so.  See Plucknett Dep. at 47; City Ex. 16.  During this meeting, Plucknett also reviewed Toliver's personnel file and located the Doctor's Note, see City Ex. 20, stating that his return to full duty was anticipated by April 22, 2014.  See Plucknett Dep. at 63.

Following this meeting, Plucknett contacted then-JSO Director of Corrections Tara Wildes (Wildes) and recommended that Toliver be placed on annual leave until the situation was resolved.  See Plucknett Dep. at 57; see also Wildes Dep. at 25.  Wildes then called Toliver and informed him of his need to take leave, which he did.[7]  See Wildes Dep. at 31-32.  That same day, Plucknett e-mailed the City's Chief of Employee and Labor Relations, Daniel Rieves (Rieves), to inform him of Toliver's situation.  See Deposition of Daniel Rieves (City Ex. 22; Rieves Dep.) at 24-25.  In response, Rieves noted that Toliver

---

[7]      Toliver did not subsequently submit a request to convert this leave to FMLA leave or otherwise utilize his remaining available FMLA leave during his final weeks of employment.  See Toliver Dep. at 141.

was anticipating a return to full duty by April 22, 2014; however, Plucknett countered that Toliver had already been on light duty for over a year, and was still "not able to perform the essential functions of his job." Id. at 27.  Significantly, Rieves also recalled Plucknett stating that Toliver would require "additional medical treatment" before being able to return to full duty.  Id.  Rieves admits that he did not obtain any independent information regarding Toliver's physical condition, instead relying upon the information provided by Plucknett and the JSO.  See id. at 12, 28-36.  Ultimately, however, the City contends that the decision to terminate Toliver rested with Rieves.  See Plucknett Dep. at 75 (Q: "Whose decision was it to terminate Mr. Toliver?" A: "Mr. Rieves."); Rieves Dep. at 32 (". . . we operate a little independent [sic], just gathering information from [JSO personnel] to make a decision, an informed decision.").

As a result of being placed on leave, Toliver believed he could wait until his scheduled April 22, 2014 office visit to obtain his doctor's authorization to return to full duty.  See Toliver Dep. at 85.  Then, on April 11, 2014, Toliver met with representatives of the City's Employee Services Department to again determine whether he wanted to participate in the ADA accommodation process.  See id. at 104-06.  During this meeting, Toliver did not ask about additional options for accommodations, and instead assumed that the representatives were only offering "the same accommodation that Ms. Plucknett had [given him]." Id. at 107.  Consequently, Toliver again refused to proceed with the accommodation process.  Id. at 107-08.  Accordingly, Toliver completed a form entitled "ADA Employee Accommodation Refusal," in which he "declin[ed] participation in the ADA Reasonable Accommodation process" for the stated reason that "[he is] not disable[d]." ADA Employee Accommodation Refusal Form (City Ex. 21).

Not long after, Plucknett received an e-mail from Debra Wood, a colleague of Rieves in the City's Employee and Labor Relations Department, containing a draft of a letter terminating Toliver's employment. See Plucknett Dep. at 70. The e-mail requested that Plucknett provide a specific termination date; however, neither she nor Rieves could recall selecting any particular date. See id. at 71; Rieves Dep. at 34. Although Plucknett could neither explain who selected the ultimate date, nor why it was selected, she did explain that Toliver was not given until April 22, 2014, to obtain his doctor's authorization to take the PAT because – in her experience – employees often underestimate the amount of time they need to return to full duty. See Plucknett Dep. at 66. On April 14, 2014, Plucknett and Wildes met with Toliver to terminate his employment.[8] See id. at 67-69. The termination letter given to him at this meeting stated, in pertinent part, as follows:

> As a result of an injury [] you have been unable to perform the duties of your current job classification, Corrections Officer, for more than 12 consecutive months, which is beyond the [] policy limits established by the [JSO] . . . you were afforded the opportunity to seek an ADA accommodation to which you declined on both occasions. Inasmuch as you have chosen not to pursue an ADA accommodation . . . and based upon your continued non-fitness for full duty . . . we are unable to continue your position with the [JSO].

Notice of Employment Separation (City Ex. 23; Termination Letter). The Termination Letter further provided that Toliver could request a meeting with Rieves within five business days to discuss his termination. Id. Although Rieves signed the letter, he later admitted that he would not have known about Toliver absent the information he received from Plucknett. See Rieves Dep. at 24, 36.

Toliver never contacted Rieves after receiving the Termination Letter. See Toliver Dep. at 149-150. Additionally, although Toliver did visit his doctor as scheduled on April

---

[8] At the time of his termination, Toliver had 113 hours of paid leave remaining, as well as 312 hours of accrued FMLA leave. Complaint ¶¶ 34-35.

22nd, he did not request authorization to return to full duty at that time, reasoning that there was no use since he "was already terminated." Id. at 151.  It was not until July 22, 2014, that Toliver received the medical authorization necessary to take the PAT and return to full duty as a corrections officer.  See Medical Authorization (City Ex. 24).  Subsequently, on or about August 26, 2014, Toliver filed a charge of disability discrimination with both the Equal Employment Opportunity Commission (EEOC) and the Florida Commission on Human Relations (FCHR).  Complaint ¶¶ 9-10.  Within ninety days of receiving a Notice of Right to Sue from the EEOC, and after 180 days passed without receiving a determination letter from the FCHR, Toliver filed suit against the City.  Id. ¶¶ 11-13.

Meanwhile, on January 22, 2015, Toliver had his administrative grievance of his April 14, 2014 termination heard before the City's Civil Service Board (CSB).  See generally City Ex. 5.  The proceedings necessarily addressed many of the same issues that are now before the Court, see id., but mainly focused on Toliver's contention that the City "never directed [him] to attend a review by the City's Medical Review Officer (MRO)" prior to his termination, see Order Denying Grievance (City Ex. 31) at 4.  Toliver argued that such a review was mandatory, while JSO countered that Toliver first needed to have his own physician declare him fit to return to full duty before he could be referred for a separate examination by the MRO.  Id.  Ultimately, the CSB concluded that "the Board's Rules do not require review by a medical officer in every instance, but rather if there are job performance or safety concerns, or if it is 'necessary' to determine whether an employee 'continues to be fit for duty.'"  Id. at 6.  For this reason, the CSB denied Toliver's grievance. See id. at 7.

III.    **Discussion**

    **A. ADA(ADAAA)/FCRA Discrimination Claims**

       **1. Threshold Issue: Claims Pled**

Pursuant to the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a).  Under the ADA, there are two distinct categories of disability discrimination: (1) disparate treatment and (2) failure to accommodate.  See, e.g., Holly v. Clairson Indus., L.L.C., 492 F.3d 1247, 1261-62 (11th Cir. 2007).   In the absence of direct evidence of discrimination, a disparate treatment claim may be evaluated under the McDonnell Douglas burden shifting framework.  See generally Jest v. Archbold Med. Ctr., Inc., 561 Fed. Appx. 887, 889 (11th Cir. 2014) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)) (additional citations omitted).  Under this framework, a qualified employee must first establish a prima facie case of discrimination, at which point the burden shifts to the employer to articulate a "legitimate[,] non-discriminatory reason" for its action.  Id. at 889-90 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993)).  If the employer does so, the employee may still prove disparate treatment by showing that the employer's proffered reason is actually pretext for discrimination.  See Richardson v. Honda Mfg. of Ala., LLC, 635 F. Supp. 2d 1261, 1278 (N.D. Ala. 2009) (citing Raytheon Co v. Hernandez, 540 U.S. 44, 49 n. 3 (2003)).  To prevail on a failure to accommodate claim, in contrast, an employee must identify a reasonable accommodation that would allow that employee to perform the essential functions of the job, after which the employer may rebut the claim by presenting

evidence that the requested accommodation would impose an "undue hardship."  <u>See</u> <u>id.</u> (citations omitted).

In the instant case, Toliver alleges that the City discriminated against him by "forcing [him] to accept an unreasonable accommodation, terminating his employment, and refusing to reemploy [him]," all because of his disability.  Complaint ¶¶ 49, 53.  He further alleges that he was "treated less favorably than similarly situated non-disabled employees," and that "any non-discriminatory reason given for treating [him] less favorably than similarly situated non-disabled employees is pretext for unlawful discrimination."  <u>Id.</u> ¶¶ 54-55. Although these allegations all appear to address a disparate treatment claim, in his Response, Toliver's counsel includes a lengthy argument in support of a failure to accommodate claim.  <u>See</u> Response at 13-18.  As such, the Court must determine – as a threshold matter – whether Toliver's Complaint properly pled a failure to accommodate claim.

The Federal Rules require that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief," and pleadings must be construed "so as to do justice."  <u>Brisk v. Shoreline Found., Inc.</u>, 654 Fed. Appx. 415, 417 (11th Cir. 2016) (quoting Fed. R. Civ. P. 8(a)(2), 8(e)).  While it is not required that a complaint specify the precise theory giving rise to recovery, it must place the defendant on notice as to the claim being asserted and the grounds on which it rests.  <u>Id.</u> (citing <u>Sams v. United Food & Commercial Workers Int'l Union</u>, 866 F.2d 1380, 1384 (11th Cir. 1989)).  Put differently, to comply with the fair notice requirement, a complaint should generally allege which acts and practices of the defendant are being complained of in a manner sufficient to allow an informed response.  <u>Klauber v. City of Sarasota</u>, 235 F. Supp. 2d 1263, 1268 (M.D. Fla.

2002) (quotation and citation omitted).  Indeed, "a defendant is not required to infer all possible claims that could arise out of the facts set forth in [a] complaint at the summary judgment stage."  Brisk, 654 Fed. Appx. at 417.

Here, the City proceeded with the defense of the case with the understanding that Toliver's ADA/FCRA claims are premised solely on a theory of disparate treatment.  See generally Motion.  While Toliver's Complaint mentions certain factual allegations which could relate to a failure to accommodate claim, see Complaint ¶¶ 22-25, 28, Toliver ultimately does not plead a failure to accommodate claim in the substantive ADA and FCRA counts of his Complaint, see generally id. ¶¶ 48-86.  Instead, Toliver asserts as part of his disparate treatment claim that the City "took adverse action against [him] by forcing [him] to accept an unreasonable accommodation . . ." Id. at 53.  Notably, an analysis of potential accommodations can be a component of both failure to accommodate and disparate treatment claims because the question of whether the affected employee is a "qualified individual" – i.e. one who can perform the essential functions of the position with or without a reasonable accommodation – is common to both claims.  See, e.g., E.E.O.C. v. Eckerd Corp., No. 1:10-CV-2816-JEC, 2012 WL 2726766, at *6, *10 (N.D. Ga. July 9, 2012).  Nevertheless, these two claims brought under 42 U.S.C. § 12112 are not the same claim "merely because the enforcement mechanism of the claims is the same statute."  See generally Klauber, 235 F. Supp. 2d at 1269.  Indeed, each violation under § 12112 establishes a different cause of action, requiring separate analyses.  See id.  Here, in reviewing the allegations contained in Toliver's Complaint, nowhere does he allege or otherwise put the City on notice that he contended the City "failed to accommodate" him.  See generally Complaint.  Consequently, the Court concludes that Toliver failed to plead a

separate claim for disability discrimination based on a failure to accommodate theory in the manner required by the applicable Rules.[9]  As such, the Court will confine its review to the disparate treatment claims – the only ones properly alleged in Counts I and II of the Complaint.  Ganstine, 502 Fed. Appx. at 909 (citing Chavis v. Clayton Cnty. Sch. Dist., 300 F.3d 1288, 1291 n.4 (11th Cir. 2002)) (refusing to address a new theory on summary judgment because the plaintiff had not amended the complaint).

### 2.  Disparate Treatment Claims[10]

#### i.  Applicable Law

In order to proceed with a disparate treatment claim, Toliver must show that: (1) he had a disability; (2) he was a qualified individual; (3) the City took an adverse employment action against him; and (4) the City "took that action because of" his disability.  See Eleventh Circuit Civil Pattern Jury Instructions, Instruction No. 4.11 (2013); see also Collado v. United Parcel Serv., Co., 419 F.3d 1143, 1152 n.5 (11th Cir. 2005).  However, because Toliver endeavors to prove – using circumstantial evidence – that the City took an adverse employment action against him on the basis of his disability, Toliver may rely on the McDonnell Douglas burden shifting framework.  See Wright v. Southland Corp., 187 F.3d 1287, 1289 (11th Cir. 1999).  Under this framework, Toliver "initially does not need to present evidence from which the trier of fact could conclude that the adverse employment

---

[9]     "At the summary judgment stage, the proper procedure for a plaintiff to assert a new claim is to [move for leave to] amend the compliant in accordance with Rule 15(a)."  See Brisk, 654 Fed. Appx. at 417 (citation omitted).  A plaintiff may not effectively amend his complaint at this stage by raising a new claim in a brief opposing summary judgment.  See Ganstine v. Sec'y, Fla. Dept. of Corr., 502 Fed. Appx. 905, 909 (11th Cir. 2012) (citing Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1297 (11th Cir. 2006)).

[10]     Toliver asserts claims for disability discrimination pursuant to both the ADA and the FCRA.  Because "disability-discrimination claims under the FCRA are analyzed using the same framework as ADA claims," the Court will consider the ADA and the FCRA claims together.  See Holly, 492 F.3d at 1255; see also Mazzeo v. Color Resolutions Int'l, Inc., 746 F.3d 1264, 1266 (11th Cir. 2014).

action taken against him was caused by improper discrimination.  Instead, he need only establish that" (1) he was disabled; (2) he was a qualified individual; and (3) "an adverse employment action was taken against him."  Id. at 1290.  Once Toliver establishes these elements, unlawful discrimination is presumed, and the City "can rebut this presumption only by articulating a legitimate, nondiscriminatory reason (or reasons) for the adverse employment action."  Id. at 1291.  If the City satisfies this burden, then Toliver "bears the burden of proving, more probably than not, that the [City] took an adverse employment action against him on the basis of [his disability]."  See id.  To do so, Toliver must show that the City's proffered reason or reasons for his termination are pretextual.  Id.

Here, the City does not dispute that Toliver was disabled at all times material to this action or that he suffered an adverse employment action by virtue of his termination.  See generally Motion.  As such, the Court will focus its analysis of Toliver's prima facie case on the question of whether the evidence presents a jury question on the issue of whether Toliver was a qualified individual.

### ii.  Qualified Individual

The ADA defines a "qualified individual" as a person who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  Essential functions are defined, in turn, as "the fundamental job duties of the employment position the individual with a disability holds or desires," though such duties explicitly "do[] not include the marginal functions of the position."  29 C.F.R. § 1630.2(n)(1).  The City contends that Toliver was not a qualified individual at the relevant time because he was unable to perform the essential functions of inmate engagement and control – as required by his position as

a corrections officer – and because he failed to suggest a reasonable accommodation that would have allowed him to perform these essential functions. See Motion at 15-17.   In response, Toliver essentially argues that he was a qualified individual because the duties of the control room assignment "did not require the physical demands needed to pass the PAT," meaning no additional accommodation was necessary.  Response at 13.

"Whether a function [of a position] is essential is evaluated on a case-by-case basis by examining a number of factors." D'Angelo v. ConAgra Foods, Inc., 422 F.3d 1220, 1230 (11th Cir. 2005) (citation omitted).  As part of this analysis, "consideration shall be given to the employer's judgment as to what functions of the job are essential, and if an employer has prepared a written description [of the job], this description shall be considered evidence of the essential functions of the job."  Id. (quoting 42 U.S.C. § 12111(8)).  Even so, this factor alone is not conclusive, and courts also will look to the testimony of the employee's supervisors. See Holly, 492 F.3d at 1257.  Additional factors to consider include, but are not limited to: (1) the amount of time spent on the job performing the function; (2) the consequences of not requiring the employee to perform the function; (3) the terms of the collective bargaining agreement, if one exists; (4) the work experience of past employees in the job; and (5) the current work experience of employees in similar jobs. D'Angelo, 422 F.3d at 1230 (citations omitted).  ADA regulations also identify a number of non-exclusive bases for deeming a job function essential. Id.  Perhaps the most relevant basis with respect to this action is that "the reason the position exists is to perform the function." Id. (citations omitted).

Toliver contends that because he could adequately perform the duties required of his control room assignment, he should be considered to have been performing the

essential functions of his corrections officer <u>position</u> as well.  <u>See</u> <u>generally</u> Response at 12-13.  In doing so, Toliver appears to echo the argument of the plaintiff in <u>Pickering v. City of Atlanta</u>, 75 F. Supp. 2d 1374, 1378 (N.D. Ga. 1999), that "duties involving prisoners are not essential to the corrections officer [position] because there are other [assignments] within the Department of Corrections that do not involve inmate interaction."  However, upon consideration of the relevant factors, and specifically those for which evidence is developed on the record, the Court concludes that Toliver's inmate-related functions are essential to his corrections officer position, and that Toliver has failed to point to evidence creating a genuine issue of fact as to whether, as of the date of his termination, he was able to perform these essential functions without an accommodation.

As a starting point, JSO's Corrections Officer Job Description states that the position's physical demands include "standing, walking, or sitting for extended periods of time" as well as "physical exertion to restrain inmates or quell a disturbance."  City Ex. 4.  Examples of work include "oversee[ing] custody of inmates . . . maintain[ing] the security of the institution . . . [and] counsel[ing] inmates" in a variety of settings.  <u>Id.</u>  Additionally, the requisite skills and abilities include the "ability to maintain order and supervise persons incarcerated" as well as the "ability to apply personal defense techniques."  <u>Id.</u>  Significantly, Toliver agrees that these are all regular responsibilities of JSO corrections officers.  <u>See</u> Toliver Dep. at 63-64.  Toliver's former supervisors do as well.  For example, Wildes, the former JSO Director of Corrections, testified that "[t]he purpose of a corrections officer is to provide care, custody, and control of inmates," including physical control.  Wildes Dep. at 48.  Plucknett, the former JSO Chief of Personnel, affirmed that engaging and restraining inmates are essential functions of the position.  <u>See</u> Plucknett Dep. at 120.

On the record before the Court it is therefore undisputed that inmate engagement and control are essential functions of the corrections officer position.  In fact, it is arguable that they are the overall reasons that the position exists.  <u>See</u> <u>Pickering</u>, 75 F. Supp. 2d at 1378. However, based on his physician's restrictions, the record reflects that Toliver was prohibited from having any direct contact with general population inmates, and he was further unable to leave the control room for any reason.  <u>See</u> Plucknett Dep. at 120-21. Moreover, as Toliver admits, the control room assignment was not permanent.  <u>See</u> Response at 12.  Consequently, Toliver's argument that the existence of the control room assignment changes the essential functions of the corrections officer position as a whole must fail.

Toliver alternatively contends that, because he was performing satisfactorily in his assignment to the control room, this is evidence that inmate engagement and control are not essential functions of <u>all</u> corrections officer positions.  <u>See</u> Response at 11. Specifically, Toliver notes that certain corrections officer assignments, such as those in the control room, do not require the same physical demands that may be required of officers with more direct access to inmates.  <u>See</u> <u>id.</u>  This is especially significant, in Toliver's view, because JSO leaves it to the discretion of the floor supervisor to determine how long a particular officer may hold a specific assignment.  <u>See</u> <u>id.</u> at 12.  In other words, it is theoretically possible that a corrections officer could be assigned to the control room for an indefinite period of time.  In support of his argument, Toliver cites to a number of cases in which courts found that a genuine issue of material fact existed as to whether an employee could perform the essential functions of his or her job.  See <u>Calvo v. Walgreens Corp.</u>, 340 Fed. Appx. 618, 623 (11th Cir. 2009) (determining that a genuine issue of material fact

existed regarding whether lifting, carrying, and pushing were essential functions of the assistant store manager position); Bynum v. MVM, Inc., 462 F. Supp. 2d 9, 11-14 (D.D.C. 2006) (determining that a genuine issue of material fact existed regarding whether a disabled court security officer could perform the essential functions of his job despite not meeting his employer's medical qualifications); Chesak v. Orange Cnty. Gov't, No. 6:06-CV-1491-ORL-31DAB, 2007 WL 4162942, at *1, *3 (M.D. Fla. Nov. 20, 2007) (determining that a genuine issue of material fact existed regarding whether a disabled fire department lieutenant employed in a purely administrative position could perform the essential functions of his position).  While those cases are instructive, they are of little value here. Indeed, in each of the cases cited by Toliver, the employee had been performing his or her job duties without an accommodation at the time that the adverse employment action occurred, but the court found a genuine issue of fact as to whether the particular job duty identified by the employer was actually an essential function of the job. Here, Toliver relies on his assignment to the control room which was – in and of itself – already an accommodation to suggest that inmate engagement and control are not essential functions of the position of a corrections officer.  See supra at 4-5.  As such, the reasoning in these cases is of little assistance.  The fact that inmate engagement and control were not essential functions of Toliver's modified temporary job assignment does not create a genuine issue of fact as to whether those are essential functions of the position of a corrections officer.  As such, the Court must next address whether there is a genuine issue of material fact as to the question of whether Toliver could perform the essential functions of the corrections officer position with a reasonable accommodation.

"When an individual is unable to perform the essential functions of a job without an accommodation, the burden of identifying an accommodation that would allow [that] individual to perform [his] job rests with that individual, as does the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable." Thomas v. Trane, a Bus. of Am. Standard, Inc., No. 5:05-CV-440(CAR), 2007 WL 2874776, at *6 (M.D. Ga. Sept. 27, 2007) (quoting Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1286 (11th Cir. 1997)) (internal quotations omitted).   As previously mentioned, an accommodation is only reasonable if it actually assists the employee in performing the essential functions of his job "presently or in the immediate future."  Id. (citing Wood v. Green, 323 F.3d 1309, 1313-14 (11th Cir. 2003)).  Here, the City reasons that, instead of making a request for a reasonable accommodation, Toliver "repeatedly memorialized" that he did not want an accommodation.  Motion at 16.  However, Toliver notes that he submitted his February 27, 2014 Doctor's Note, see City Ex. 16, which amounts to a request for an accommodation allowing him to remain on light duty until April 22, 2014 – a request that the City implicitly rejected.  See Response at 14-15.

In support of his position, Toliver cites to cases standing for the general proposition that a doctor's note with restrictions is sufficient to constitute a request for an accommodation.  See, e.g., E.E.O.C. v. Chevron Phillips Chem. Co., LP, 570 F.3d 606, 621-22 (5th Cir. 2009) (determining, in the context of a failure to accommodate claim, that a reasonable jury could conclude that an employee communicated her request for an accommodation when the employer was previously aware that the employee had required medical leave for her disability and the employee later provided a doctor's note relating to the disability); see also Roundtree v. Florida, No. 3:13-CV-1490-J-25MCR, 2015 WL

3756811, at *3-*4 (M.D. Fla. May 26, 2015) (collecting cases).  "Although the Eleventh Circuit has previously not 'determined precisely what form the request [for reasonable accommodation] must take,' it recently indicated that 'for a demand to be specific enough to trigger the duty to provide a reasonable accommodation, the defendant must have enough information to know of <u>both</u> the disability <u>and desire for accommodation</u>, or circumstances must at least be sufficient to cause a reasonable [employer] to make appropriate inquiries about the possible need for an accommodation.'" <u>Salser v. Clarke Cnty. Sch. Dist.</u>, 802 F. Supp. 2d 1339, 1355-56 (M.D. Ga. 2011) (emphasis in original) (quoting <u>United States v. Hialeah Hous. Auth.</u>, 418 Fed. Appx. 872, 876 (11th Cir. 2011) (per curiam)).

A request for an accommodation of an indefinite duration, with no indication that the employee will be able to resume performing the essential functions of his position in the present or immediate future, is not a request for a reasonable accommodation.  <u>See generally</u> <u>Tolbert v. James</u>, No. 2:13-CV-427-WKW, 2015 WL 2169950, at *8 (N.D. Ala. May 8, 2015) (citing <u>Wood</u>, 323 F.3d at 1314).  On the other hand, a request for an accommodation of a definite duration may be reasonable in certain circumstances.  <u>See generally</u> <u>Spears v. Creel</u>, 607 Fed. Appx. 943, 950 (11th Cir. 2015) (citing <u>Wood</u>, 323 F.3d at 1314).  In Toliver's case, his February 27, 2014 Doctor's Note states that he anticipated a return to full duty by April 22, 2014, <u>see</u> City Ex. 20, a definite period of less than two months.[11]  The record evidence suggests that Plucknett – relying on her past experience with others – did not find this time frame to be credible.  <u>See</u> Plucknett Dep. at 66-67.  While the City also notes that Toliver was not actually cleared to return to full duty until July of

---

[11]	By the time Toliver's light duty period expired, he anticipated a return to full duty in less than three weeks.  <u>See id.</u>

2014, four months later, Toliver explains that having been terminated he did not see a need to seek a medical release on April 22nd.  See Toliver Dep. at 151.

The City contends that Toliver was not a qualified individual because he could not complete the PAT as necessary to return to full duty and because he rejected any accommodation stating that he was not disabled.  See Motion at 15-17.  However, genuine issues of fact remain as to these issues.  Viewing the evidence in the light most favorable to Toliver[12], a jury could reasonably conclude that his February 27, 2014 Doctor's Note was a request for an accommodation to remain on light duty until April 22nd, at which time he expected to be cleared to be able to take the PAT and return to full duty in his position as a corrections officer.  Plucknett was aware of both Toliver's disability, see Plucknett Dep. at 33-34, and his Doctor's Note, see id. at 63, during their April 4, 2014 meeting.  She also knew that Toliver wished to remain in his position as a corrections officer and continue to do his job.  See City Ex. 19.  Even so, in Toliver's view, she essentially rejected the Doctor's Note as a request for an accommodation, later explaining that employees often underestimate the amount of time they need to return to full duty.  See Plucknett Dep. at 66.  Having rejected the accommodation requested in Toliver's Doctor's Note, Plucknett then offered Toliver two other positions which Toliver found undesirable and unreasonable, causing him, at that time, to reject the City's proffered accommodation.  Whether Toliver's rejection of the accommodation process at the April 4 meeting and thereafter constituted a rejection by Toliver of any accommodation, as the City contends, or a rejection of those

---

[12]     As discussed supra, for the purposes of resolving the City's Motion, the Court views all disputed facts and reasonable inferences in the light most favorable to the nonmoving party.  The Court notes that these facts may differ from those ultimately proved at trial.  See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).

other accommodations in place of his request to remain on light duty up to April 22nd are issues of fact which must be determined by a jury.

On this record, the Court determines that genuine issues of fact remain with respect to whether Toliver was a qualified individual with a disability.  Those issues of fact include the questions of: (1) whether Toliver rejected any accommodation; (2) whether Toliver's Doctor's Note constituted a request for a reasonable accommodation – that is, additional time to obtain a medical clearance to take and pass the PAT; and (3) whether with that accommodation Toliver could have taken the PAT and returned to full duty immediately after April 22nd.

### iii.  Legitimate Business Reason

Because the Court has determined that the City is not entitled to summary judgment based on its contention that Toliver was not a qualified individual, the burden now shifts to the City to articulate a legitimate, nondiscriminatory reason (or reasons) for his termination. See Wright, 187 F.3d at 1291.  In this regard, the City maintains that Toliver was terminated because of his "inability to take and pass the [PAT] within excess [sic] of twelve months," as required.  Motion at 17.  Specifically, the City states that "regardless as to whether [Toliver] actually suffered from a disability, an impairment or a common cold, had he failed to take and pass the [PAT] for over twelve months, he then would still have lost his corrections officer position. . . ." Id. at 18.  Both the JSO CO PAT Policy, see City Ex. 6, and the terms of the Collective Bargaining Agreement, see City Ex. 8, provide that:

> Employees who do not successfully pass the PAT after one year and who have had a reasonable opportunity to pass the test, and/or who are otherwise determined to be unfit for duty, may be removed from corrections positions.

<u>See</u> City Ex. 6; City Ex. 8 (emphasis added).  It is undisputed that Toliver did not take the PAT prior to his termination because he was not medically cleared to do so.  <u>See</u> <u>supra</u> at 8-10.  Hence, this satisfies the City's burden of providing a "legitimate, non-discriminatory" reason for Toliver's termination.[13]  <u>See</u> <u>Hunter v. Santa Fe Protective Servs., Inc.</u>, 822 F. Supp. 2d 1238, 1246-47 (N.D. Ala. 2011) (applying the <u>McDonnell Douglas</u> burden shifting analysis in a case involving age discrimination, and finding a legitimate reason for termination where candidates for security guard positions were medically unable to take and pass a physical agility test as required by the employer's contract with the United States Army).

### iv.  Pretext

Because the City has offered a legitimate, non-discriminatory reason for Toliver's termination, "to avoid summary judgment [Toliver] must introduce significantly probative evidence showing that the asserted reason is merely pretext for discrimination.'"  <u>Bojd v. Golder Assocs., Inc.</u>, 212 Fed. Appx. 860, 862 (11th Cir. 2006) (quoting <u>Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.</u>, 446 F.3d 1160, 1163 (11th Cir. 2006)).  "'If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.'"  <u>Id.</u> (quoting <u>Wilson v. B/E Aerospace, Inc.</u>, 376 F.3d 1079, 1088 (11th Cir. 2004)).  "[T]he inquiry 'proceeds to a new level of specificity,' in which the plaintiff must show that the proffered reason is really a pretext for unlawful

---

[13]     In determining that the City has satisfied its burden, the Court also notes that it is generally permissible for an employer to require a medical evaluation to assess an employee's fitness to return to work after a health related absence.  <u>See</u> <u>Rodriguez v. Sch. Bd. of Hillsborough Cnty., Fla.</u>, 60 F. Supp. 3d 1273, 1278 (M.D. Fla. 2014) (citing <u>Dockens v. DeKalb Cnty. Sch. Sys.</u>, 441 Fed. Appx. 704, 708-09 (11th Cir. 2011)); <u>see also</u> <u>Lyons v. Miami-Dade Cnty.</u>, 791 F. Supp. 2d 1221, 1228 (S.D. Fla. 2011) (determining that an employer's requirement that an employee undergo a medical exam after returning from medical leave was reasonable inasmuch as it allowed the employer to determine whether the employee was able to perform her job related functions).  Although Toliver was not returning from an absence <u>per se</u>, the reasoning of these cases is analogous.

discrimination." E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272-73 (11th Cir. 2002) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255-56 (1981)). Moreover, the Court does not sit "as a 'super-personnel department,' and it is not [the Court's] role to second-guess the wisdom of an employer's business decisions – indeed the wisdom of them is irrelevant – as long as those decisions were not made with a discriminatory motive." Id. (quoting Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000)).

An employee may show pretext directly, by persuading the court that his employer was more likely motivated by discrimination in taking action against him, or indirectly, by showing that the "employer's proffered explanation is unworthy of credence." Dulaney v. Miami-Dade Cnty., 481 Fed. Appx. 486, 490 (11th Cir. 2012) (quoting Burdine, 450 U.S. at 256). In the latter case, evidence of pretext is that which tends to show "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its actions [such] that a reasonable factfinder could find them unworthy of credence." Id. (quoting Brooks, 446 F.3d at 1163). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011) (internal quotation and footnote omitted).

Here, Toliver alleges that there are "a number of inconsistencies [concerning] Plucknett's statements and actions regarding Toliver's termination which taken both individually, and as a whole [,] establish pretext." Response at 18. In particular, Toliver notes that: (1) Plucknett said he could continue his employment as a corrections officer if

he obtained a medical release from his doctor; (2) he remained employed by the City after the expiration of his one year period of light duty – without having taken or passed the PAT – for approximately two to three weeks; (3) Plucknett misled him regarding his options for accommodations, only offering positions with less compensation and benefits; and (4) Plucknett considered his disability "as completely prohibiting him from performing the essential functions of his job." See Response at 18-20.

Notably, Toliver's arguments regarding pretext focus largely on Plucknett's role in his termination.  In addition to his contentions that Plucknett ignored the request to extend his light duty through April 22nd and instead offered only unreasonable accommodations, Toliver argues that Plucknett used her own, ill-informed judgment to conclude that his medical condition would have a more lasting impact on his ability to perform the essential functions of his job and that this conclusion motivated the City's decision to terminate him. See generally id. at 19-20.   In support of this argument, Toliver offers the following evidence: (1) Plucknett originally offered him until April 18, 2014, to consider pursuing an ADA accommodation, but then fired him four days earlier on April 14th; (2) Plucknett was asked to provide his termination date, though she could not recall having done so; (3) Plucknett rejected Rieves' proposal to give Toliver more time to obtain authorization to return to full duty, asserting that doctor's notes often fail to accurately indicate when an employee will be fit to return; and (4) Plucknett represented to Rieves that Toliver needed additional medical treatment to aid his recovery – a statement which finds no support in the evidence. See id. at 19.   Taken together, Toliver seeks to demonstrate via this evidence that Plucknett was primarily responsible for the decision to terminate him, and that she was motivated by a discriminatory animus in doing so.

Although Rieves testified that he made the final decision to terminate Toliver, <u>see</u> Plucknett Dep. at 75, he relied almost exclusively on information provided by Plucknett in making this decision, <u>see</u> Rieves Dep. at 21-33.  Viewing the record evidence in the light most favorable to Toliver, as the Court must at this stage of the proceedings, the Court finds that Toliver has raised genuine issues of fact regarding the reasons for the City's decision to terminate his employment on April 14, 2014.  <u>See</u> <u>Hargett v. Fla. Atl. Univ. Bd. of Trs.</u>, __ F. Supp. 3d ____, 2016 WL 6634912, at *9 (S.D. Fla. 2016) (citing <u>Smith</u>, 644 F.3d at 1328) (noting that, to survive summary judgment, an employee must introduce "some circumstantial evidence of [his supervisor's] animus to causally link the adverse [employment] action with [his] disability").  As such, the Court concludes – for the purposes of summary judgment – that Toliver introduced "evidence that could form the basis for a finding of facts, which when taken in the light most favorable to the non-moving party, could allow a jury to find by a preponderance of the evidence that [Toliver] has established pretext." <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 921 (11th Cir. 1993).  Based on the foregoing, the Court determines that summary judgment is due to be denied as to Toliver's claims for violations of the ADA/ADAAA and FCRA in Counts I and II of the Complaint.

### B. FMLA Interference Claim

Next, the Court turns to Toliver's FMLA interference claim set forth in Count III of the Complaint.  Under the FMLA, eligible employees are entitled to up to twelve weeks of unpaid leave annually "[b]ecause of a serious health condition that makes the employee unable to perform the functions of [his or her] position."  29 U.S.C. § 2612(a)(1)(D).  A serious health condition is an illness, injury, impairment, or other condition that involves

either inpatient care or continuing treatment by a health care provider.  <u>See</u> 29 U.S.C. § 2611(11).  In the instant case, Toliver contends that the City interfered with his FMLA rights by: (1) failing to notify him of his FMLA rights; and (2) by failing to provide FMLA leave for his health condition.  <u>See</u> Complaint ¶¶ 40, 73-74.  In response, the City argues that "[i]n addition to granting his FMLA [L]eave [R]equests upon every submission, [JSO] reminded Toliver of his actual ability to request additional leave" upon his return to work following his second surgery.  Motion at 19.

To state a valid claim for FMLA interference, an employee must demonstrate that he was denied a benefit to which he was entitled under the FMLA.  <u>Martin v. Brevard Cnty. Pub. Sch.</u>, 543 F.3d 1261, 1266-67 (11th Cir. 2008); <u>see also</u> <u>Lowery v. Strength</u>, 356 Fed. Appx. 332, 333 (11th Cir. 2009) (quotation omitted); <u>Rudy v. Walter Coke, Inc.</u>, 613 Fed. Appx. 828, 830 (11th Cir. 2015) (citation omitted).  Thus, "[a]n interference claim has two elements: (1) the employee was entitled to a benefit under the FMLA, and (2) [his] employer denied [him] that benefit."  <u>White v. Beltram Edge Tool Supply, Inc.</u>, 789 F.3d 1188, 1191 (11th Cir. 2015) (citation omitted).  "Interfering with the exercise of an employee's [FMLA] rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave."  29 C.F.R. § 825.220(b); <u>see</u> <u>also</u> <u>Lowery</u>, 356 Fed. Appx. at 334.

Here, the record reflects that Toliver repeatedly availed himself of his FMLA rights during his term of employment with JSO.  <u>See</u> City Ex. 11.  Indeed, between 2011 and 2014, Toliver was permitted to take FMLA leave no less than four times, and none of his requests were denied.  <u>See</u> <u>id.</u>  As Eleventh Circuit precedent dictates, "a plaintiff suffers no FMLA injury when []he receives all the leave []he requests, and indeed is paid for most

of it." Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1275 (11th Cir. 1999) (per curiam).  Moreover, upon returning to work after his surgery in 2014, Toliver admits that he never again requested the use of any FMLA leave.  See Toliver Dep. at 141 (Q: "To your knowledge . . . did you ever submit any more requests for family medical leave, FMLA?" A: "I don't recall. To my knowledge, no.").  This is so despite the fact that he was informed, via e-mail, of the availability of his remaining FMLA leave.[14]  See City Ex. 33.  Hence, although Plucknett admits that she did not discuss with Toliver his ability to request additional FMLA leave during their April 4, 2014, meeting, see Plucknett Dep. at 49, there is simply no record evidence supporting the allegations in Toliver's Complaint that the City failed to inform him of his FMLA rights or failed to provide him with FMLA leave upon request, see Complaint ¶¶ 73-74, at any time material to this action.

Tellingly, Toliver does not offer any evidence in support of this claim aside from what is alleged in the Complaint.  See generally Complaint; Toliver Dep.  During his deposition, Toliver admitted to requesting and receiving FMLA leave in December of 2012, which ultimately lasted until March of 2013.  See Toliver Dep. at 123.  Then, after initially denying that he had submitted any later requests for FMLA leave, see id. at 124, and subsequently having his recollection refreshed, see id. at 141, Toliver ultimately admitted that he also requested and received FMLA leave in January of 2014, see id.  At the same time, Toliver never testified or offered other evidence that the City denied his FMLA Leave Requests or otherwise discouraged him from making them.  See generally Toliver Dep.; Response.

---

[14]     Specifically, after submitting a request to work no more than five days a week during his period of recuperation from his second surgery, Toliver received an e-mail on February 7, 2014, informing him that – if his request was not administratively approved – he would have to utilize his remaining available FMLA leave for any weeks in which he was scheduled to work more than five days.  See City Ex. 33.

"If the non-movant fails to properly address another party's assertion of fact as required by Rule 56[], then the Court may consider the fact undisputed for purposes of the motion and grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." See, e.g., Murray v. Ingram, No. 3:10-CV-384-MEF, 2011 WL 671604, at * 2 (M.D. Ala. Feb. 3, 2011) (quoting Rule 56(e)(2)-(3)) (internal quotations omitted).   Indeed, "[w]hen a motion for summary judgment is made and supported . . . an adverse party may not rest upon the mere allegations or denials of [that party's] pleading, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Clark, 929 F.2d at 606 n. 5 (quoting Rule 56(e)).   If the adverse party's response fails do to so, the entry of summary judgment against that party may be appropriate. Id.   As such, on this record, the Court determines that no reasonable jury could find that the City interfered with Toliver's right to FMLA leave, and summary judgment is therefore due to be granted in favor of the City as to the FMLA interference claim in Count III of the Complaint.

## C. FMLA Retaliation Claim

Although it appears that the City may have intended to move for summary judgment with respect to Toliver's claim for FMLA retaliation, see Motion at 18, it failed to do so, see generally id.   Notably, when summarizing the claims Toliver brought in this action, the City failed to reference Toliver's claim that the City retaliated against him for taking FMLA leave. See id. at 1.   On the record before the Court, there is no indication that Toliver intended to abandon this claim.   As such, the Court will not consider the merits of this claim in ruling on the City's Motion.

## IV.    Conclusion

In light of the foregoing, the City's Motion is due to be granted, in part, and denied, in part.  Accordingly, it is hereby

**ORDERED**:

Defendant City of Jacksonville's Dispositive Motion for Summary Judgment (Doc. No. 20) is **GRANTED, in part, and DENIED, in part,** as follows:

1.    The Motion is **GRANTED** with respect to the FMLA interference claim in Count III of the Complaint (Doc. No. 1).

2.    Otherwise, the Motion is **DENIED**.

**DONE AND ORDERED** at Jacksonville, Florida on March 31, 2017.

MARCIA MORALES HOWARD
United States District Judge

lc24

Copies to:

Counsel of Record